IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

SAMMY RASEMA YETISEN *aka*
RASEMA HANDANOVIC *aka*
ZOLJA,

        Defendant.

No. 3:18-cv-00570-HZ

OPINION & ORDER

Steven A. Platt
Timothy M. Belsan
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

Dianne Schweiner
U.S. ATTORNEY'S OFFICE-DISTRICT OF OREGON
Civil Division
1000 SW Third Avenue, Suite 600
Portland, OR 97204

    Attorneys for Plaintiff

1- OPINION & ORDER

Sammy Rasema Yetisen
2088 NW Cadbury Ave. #203
Beaverton, OR 97006

    *Pro Se* Defendant

HERNÁNDEZ, District Judge:

    Plaintiff United States of America ("the Government") seeks to revoke Defendant Sammy Rasema Yetisen's naturalized United States of America ("U.S.") citizenship. The Government alleges that Defendant committed war crimes in her native country, Bosnia, and then procured her U.S. citizenship illegally and by concealment or willful misrepresentation of material fact. The Government moves for judgment on the pleadings. The Court grants the Government's motion because it concludes that Defendant procured her citizenship illegally.

## BACKGROUND[1]

    Defendant is a Bosnian Muslim. Compl. ¶ 11, ECF 1. She was born in 1972 in the Socialist Republic of Bosnia and Herzegovina, which was then part of Yugoslavia. *Id.* at ¶ 8. In the early 1990s, some of Yugoslavia's republics began seceding, which triggered a series of ethnic-based conflicts. *Id.* at ¶ 14. Tension between Bosnian Muslims and predominantly Roman-Catholic Croats from Bosnia and Herzegovina ("Bosnian Croats") developed into an open conflict known as the Croat-Bosniak War. *Id.* at ¶ 19.

    In January 1993, Defendant joined a special-forces unit within the Supreme Command Staff of the Army of the Republic of BiH (Bosnia and Herzegovina) called the Zulfikar Special Purposes Detachment ("Zulfikar"), VJ5683. *Id.* at ¶¶ 22, 51. On April 16, 1993, Defendant and

---

[1] The Court accepts as true all factual allegations in Defendant's Answer and Response to Plaintiff's Motion for Judgment on the Pleadings, as well as all factual allegations from the Complaint that Defendant admits or fails to deny. *See* Fed. R. Civ. Pro. 8(b)(6) ("An allegation is admitted if a responsive pleading is required and the allegation is not denied."); *see also Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir. 1989).

other members of Zulfikar attacked the village of Trusina, a village in what is now central Bosnia. *Id.* at ¶ 25. Defendant and other Zulfikar members targeted Bosnian Croats. ¶¶ 13, 29-30. They executed six Bosnian Croats, three prisoners of war and three civilians, by firing squad. *Id.* at ¶ 40. They killed sixteen other Bosnian Croats during what became known as the "Trusina massacre." *Id.* at ¶ 43. In her Answer[2], Defendant states:

> What the government says in its papers is not correct. They do not understand war. Yes I was in the civil war. I was 20 years old and a female in an army of men when we went into Trusina. The government writes like I was giving orders but I was not, I did what the commander told us to do.

Answer, ECF 5.

Less than three years after the Trusina massacre, Defendant sought refugee status at the U.S. embassy in Austria. *Id.* at ¶ 44. Defendant filed a Form I-590—Registration for Classification as a Refugee on October 31, 1995. Compl. Ex. C. On the form, Defendant sought refugee status based on persecution she faced due to being Muslim. *Id.* She wrote that she had "nowhere to return to in Bosnia." *Id.* Defendant states, "I told them I was a solider in the Army and we talked all about it and they saw my condition and what war had done." Answer. On the form, she stated that she had served in the Bosnian army from September 3, 1992 until May 12, 1995, in "branch and organization" VJ 5089. *Id.* She also wrote: "I fought for Bosnia in the Bosnian army, but when I was no longer able to do battle, I was demobilized and left without

---

[2] Defendant requested appointment of counsel. Answer. While there is no constitutional right to counsel in a civil case, *United States v. 30.64 Acres of Land*, 795 F.2d 796, 801 (9th Cir. 1986), the Court exercised its discretion to request volunteer counsel for Defendant. Order, June 6, 2018, ECF 6. Between June and October of 2018, the Court appointed four different attorneys as *pro bono* counsel; however, each attorney requested termination of the appointment. Therefore, on October 26, 2018, the Court held a status conference and set a case schedule for this case to proceed with Defendant representing herself *pro se*. Minutes of Proceedings, Oct. 26, 2018, ECF 23. In recognition of Defendant's *pro se* status, the Court has construed her filings liberally. *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

help, shelter, and worst of all, without food." *Id.* She wrote: "I dismissed myself and went to Austria where I have no-one." *Id.*

On February 2, 1996, Defendant filled out a Form G-646, "Sworn Statement of Refugee Applying for Entry into the United States. Compl. Ex. D. Defendant indicated that she was not a part of "any of the following classes [that] are not admissible to the United States": "Aliens who have committed or who have been convicted of a crime involving moral turpitude[.]" *Id.* She also signed the form, thereby assenting to the following statement: "Further, I have never ordered, assisted or otherwise participated in the persecution of any person because of race, religion, or political opinion." *Id.* Defendant's refugee status was approved on May 2, 1996. Compl. Ex. C. She entered the United States as a refugee on May 15, 1996. *Id.*; Compl. ¶ 66.

On June 6, 2001, Defendant applied for naturalization by filing a Form N-400, Application for Naturalization. Compl. Ex. E. Form N-400 required Defendant to mark a "yes" or "no" box next to several "additional eligibility factors." *Id.* Defendant marked "no" in response to the following two questions:

> (3) Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?
>
> (15)(a) Have you ever knowingly committed any crime for which you have not been arrested?

*Id.* Form N-400 also required Defendant to list her present and past membership with "any military service." *Id.* Defendant wrote "none." *Id.* Defendant signed her Form N-400, under penalty of perjury, attesting that the application was "true and correct." *Id.* She signed the form again following her naturalization interview. *Id.* On May 23, 2002, Defendant was issued a Certificate of Naturalization. Compl. Ex. F.

Over nine years later, this Court granted the Government's request for a certificate of extradibility, based on a Warrant of Arrest issued by the Prosecutor's Office of Bosnia and Herzegovina, alleging that Defendant committed war crimes against civilians and prisoners of war. *Id.* at ¶¶ 90, 97. Magistrate Judge Stewart held that Defendant was extraditable on the alleged offenses that constituted first degree murder. *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 983 (D. Or. 2011). In December 2011, the Government extradited Defendant to Bosnia and Herzegovina. Compl. ¶ 99.

On April 26, 2012, Defendant entered into a Plea Agreement with the Bosnia and Herzegovina Prosecutor's Office. Compl. Ex. B. Defendant was convicted of violating Articles 173(1)(c) and 175(1)(a) of the Criminal Code of Bosnia and Herzegovina, based on the offenses of War Crimes against Civilians and War Crimes against Prisoners of War. *Id.* at 3. Defendant was found guilty of "participating in the summary execution" of six Bosnian Croats. *Id.* at 4. Her acts were found to "have satisfied the underlying elements of the criminal offense of murder by depriving three civilians and three war prisoners of their lives with direct intention, that is, by execution." *Id.* at 21.

Defendant was sentenced to a term of imprisonment of 5 years and 6 months. *Id.* at 4-5. After she served time, she was released and she returned to Oregon. Compl. ¶ 104; Answer.

## STANDARDS

### I.  Rule 12(c)—Judgment on the Pleadings

A motion for judgment on the pleadings may be brought after the pleadings are closed but within such time as not to delay the trial. Fed. R. Civ. P. 12(c). Rule 12(c) is "functionally identical" to Rule 12(b)(6) and "the same standard of review" applies to motions brought under either rule. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1054 n.

4 (9th Cir. 2011) (internal quotation marks omitted). "A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *United States v. Teng Jiao Zhou*, 815 F.3d 639, 642 (9th Cir. 2016); *Fajardo v. Cty. of L.A.,* 179 F.3d 698, 699 (9th Cir. 1999). In evaluating a motion for judgment on the pleadings, the allegations of the non-moving party are credited as true, whereas those allegations of the moving party which have been denied are deemed false for purposes of the motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

A court may properly consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."). "However, judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Hal Roach Studios, Inc.,* 896 F.2d at 1550.

## II. 8 U.S.C. § 1451(a)—Revocation of Naturalization

Under 8 U.S.C. § 1451(a), the government may file a complaint to revoke naturalization if a citizen's naturalization was "illegally procured" or "[was] procured by concealment of a material fact or by willful misrepresentation." *Zhou*, 815 F.3d at 642; 8 U.S.C. § 1451(a).

A naturalized individual's citizenship "should not be taken away without the clearest sort of justification and proof," *Schneiderman v. United States,* 320 U.S. 118, 122 (1943), as "its loss

can have severe and unsettling consequences," *Fedorenko v. United States,* 449 U.S. 490, 505 (1981). Due to the extremely high stakes involved, "[t]he evidence justifying revocation of citizenship must be clear, unequivocal, and convincing and not leave the issue in doubt." *Zhou*, 815 F.3d at 642 (citing *Federenko*, 449 U.S. at 505) (internal quotation marks omitted). "If the government meets its high burden, however, a court must enter a judgment of denaturalization—it lacks any discretion to do otherwise." *Id.*

## DISCUSSION

The Government's Complaint to Revoke Naturalization brings five counts against Defendant, all of which seek the same relief: revocation of Defendant's naturalization. The Government moves for judgment on the pleadings on Count IV, Illegal Procurement of Naturalization—Lack of Good Moral Character (Murder Outside Statutory Period); and Count V, Procurement of Naturalization by Concealment of a Material Fact or by Willful Misrepresentation. Defendant opposes the motion. The Court grants the Government's motion for judgment on the pleadings on Count IV and declines to reach the arguments regarding Count V.

### I.    Illegal Procurement of Naturalization (Count IV)

The Government contends that Defendant's naturalization should be revoked because it was illegally procured. The Government alleges that, when she applied for naturalization, Defendant lacked good moral character because she had committed murder, a crime involving moral turpitude.

Naturalization was "illegally procured" if the individual did not meet the statutory requirements for citizenship. *Fedorenko*, 449 U.S. at 506; *United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007). One requirement for citizenship is that an applicant must be of "good moral

character." 8 U.S.C. § 1427(a). Typically, the required statutory period for good moral character begins five years before the date the applicant files the application for naturalization; however, the Government may also take into consideration "acts at any time prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been a reform of character from an earlier period or if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character." 8 U.S.C. § 1427(a), (e); 8 C.F.R. § 316.10(a).

Furthermore, a conviction for murder is a bar to the good moral character requirement, regardless of the date of conviction. 8 C.F.R. § 316.10(b)(1)(i) ("An applicant shall be found to lack good moral character, if the applicant has been . . . convicted of murder at any time[.]"); *Castiglia v. I.N.S.*, 108 F.3d 1101, 1104 (9th Cir. 1997) ("It is evident that Congress intended that any conviction for murder will bar naturalization, regardless of the date of the conviction or the length of the period for establishing good moral character."). Murder is a crime involving moral turpitude and an aggravated felony, both of which also preclude a finding of good moral character. *Rivera v. Lynch*, 816 F.3d 1064, 1075 (9th Cir. 2016) (listing murder as an example of a crime involving moral turpitude); 8 U.S.C. § 1101(f)(3) (person who commits crime involving moral turpitude lacks good moral character); 8 U.S.C. § 1101(a)(43)(A) (definition of "aggravated felony" includes murder); 8 U.S.C. § 1101(f)(3), (f)(8) (person lacks good moral character if convicted of an aggravated felony at any time).

Defendant does not dispute that she pled guilty and, thus, was convicted of War Crimes against Civilians and War Crimes against Prisoners of War in Bosnia and Herzogovina. She also does not dispute any of the factual findings of the "First Instance Verdict of the Prosecutor's

Office of Bosnia and Herzegovina v. Rasema Handanovic[3]," which concludes that Defendant committed murder "by depriving three civilians and three war prisoners of their lives with direct intention, that is, by execution." *See* Compl. Ex. B at 21. Nor does she challenge this Court's prior holding that "[t]he most closely analogous offenses in the United States for the acts allegedly committed by Handanović are first degree murder, 18 U.S.C. § 1111(a), and attempted murder, 18 U.S.C. § 1113[.]" *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 990 (D. Or. 2011). She does not dispute that she participated in the execution of at least six people, including prisoners of war and civilians, during the Trusina massacre.

Instead, Defendant opposes the Government's motion because she did not know that her actions in Trusina constituted a crime until she was extradited to Bosnia, at which point she "accepted punishment and . . . fully served." Def. Resp. 2, ECF 31[4]. She explains further:

> I have served time for what I didn't know that was crime prior to my extradition to Bosnia. Ones [*sic*] I learned from Bosnian prosecutor that just being in Trusina, regardless if I had to follow orders as soldier or disobey them it was considered to break the law. I decided to cooperate with Bosnian government, serve my sentence, and testified in same case by telling them truth what happened that day.

*Id.* Defendant further contends that she is being punished for the same crime twice and that she never lied when she applied for refugee status and citizenship. *Id.*

The Court construes Defendant's objection to being punished for the same crime twice as an invocation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution. *See* U.S. Const. amend. V ("No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."). However, the Clause "prohibits only the

---

[3] Defendant entered the United States using the name Rasema Handanovic. Def. Resp. 2, ECF 31. When she obtained citizenship, she changed her name to Sammy Rasema Yetisen. *Id.*; *see also In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 993 (D. Or. 2011).
[4] Defendant filed two opposition documents in response to the Government's motion. *See* ECF 27 and 31. Because her response at ECF 31 encompasses all the arguments she raised in ECF 27, the Court cites to Defendant's response at ECF 31 in this Opinion & Order.

imposition of multiple *criminal* punishments for the same offense," *United States v. Camacho*, 413 F.3d 985, 988 (9th Cir. 2005), and denaturalization under 8 U.S.C. § 1451 is a civil proceeding. *Compare* 8 U.S.C. § 1451 (civil denaturalization statute) *with* 18 U.S.C. § 1425 (criminal denaturalization statute). This is a civil case, not a criminal case. *See* Order, June 6, 2018, ECF 6. Thus, the Double Jeopardy Clause does not apply.

As to whether Defendant knew that she had committed a crime, this could be relevant as to whether she was truthful to the best of her ability on her refugee and naturalization forms. However, it does not change her actions in the Trusina massacre or the fact that her conduct would have served as a bar to citizenship, if the Government had been aware of it when she applied.

The Ninth Circuit has explained that the Government is not required to prove that Defendant knew her conduct was illegal at the time she naturalized. *Zhou*, 815 F.3d at 645. In *Zhou*, the defendant was convicted of robbery, yet he maintained his innocence. *Id.* He argued that he had no knowledge that he had committed a crime and, thus, any misrepresentation on his naturalization forms was inadvertent. *Id.* The Court held that "whether at the time he took the oath of allegiance [Zhou] knew that he violated any specific law or that he lacked moral character is irrelevant" to the Court's analysis as to whether he "illegally procured" naturalization. *Id.* The defendant had committed robbery and that fact alone meant that the defendant could not establish good moral character under Section 1101(f) and 8 C.F.R. § 316.10(b)(3)(iii). Therefore, the district court was "required to enter a judgment of denaturalization." *Id.*

As applied here, Defendant's contention that she did not know she had broken the law until she was extradited to Bosnia does not save her from a finding of a lack of good moral

character. Similarly, even if it were true that she never lied on her refugee status and citizenship forms, that would not mitigate the fact that she committed a serious crime involving moral turpitude—murder. Defendant does not contest the underlying facts or the validity of her conviction. The fact that she did not know that her actions technically constituted a crime is irrelevant.

Defendant also argues that it is unfair for the Government to wait 23 years from when she entered the United States until the present to challenge her eligibility for refugee status or citizenship. The Court acknowledges that a long time has passed since Defendant left Bosnia. The Court is sympathetic to the fact that Defendant has established a life in the United States, she has spent most of her adult life here, she has a son who is a U.S. citizen, and this country is now where she considers home. *See* Answer. However, the passage of time does not change the basic facts regarding Defendant's eligibility to become naturalized. *See Zhou*, 815 F.3d 639 ("While we fail to understand why the government waited nearly two decades to bring this action against an otherwise law-abiding individual, ultimately our lack of comprehension is irrelevant.").

Furthermore, it appears to the Court that Defendant only returned to the United States at some point in the last few years, after serving her sentence in Bosnia. *See* Compl. ¶ 103 (Defendant was sentenced to a term of imprisonment of 5 years and 6 months on April 30, 2012); Def. Response at 2-3 (implying that she served a sentence of five years, starting in 2012, and then returned to the United States). Thus, the delay between the time of Defendant's return to the U.S. after release from imprisonment and the initiation of these proceedings does not implicate a laches defense, which requires proof of a lack of diligence by the party against whom the defense is asserted. *See, e.g., Dang*, 488 F.3d at 1144 (noting that most denaturalization proceedings are instituted beyond a five-year period from when the defendant is naturalized or convicted); *see*

*also United States v. Arango*, 686 Fed. App'x 489, 490 (9th Cir. 2017) (recognizing that whether laches even applies to a denaturalization proceeding is an "open question" in the Ninth Circuit).

The Court recognizes that the loss of Defendant's citizenship may have "severe and unsettling consequences." *See Fedorenko,* 449 U.S. at 505. However, the evidence presented by the Government is clear, unequivocal, and convincing. The Court concludes that it must enter a judgment of denaturalization and that it lacks discretion to do otherwise.

II. **Procurement of Naturalization by Concealment of a Material Fact or by Willful Misrepresentation (Count V)**

Because the Government met its burden in Count IV of showing that Defendant's citizenship was illegally procured, the Court declines to reach the Government's arguments under Count V.

## CONCLUSION

Defendant's motion for judgment on the pleadings [25] is GRANTED. Because Defendant lacked the good moral character requisite for naturalization, the Court finds that her citizenship was illegally precured. The Government is directed to prepare a Judgment revoking Defendant's naturalization, consistent with this Opinion & Order, and submit it to the Court within 14 days of the date below.

IT IS SO ORDERED.

Dated this ___28___ day of ___Feb___, 2019.

MARCO A. HERNÁNDEZ
United States District Judge