IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                     No. 3:18-cv-00570-HZ

                Plaintiff,                   OPINION & ORDER

      v.

SAMMY RASEMA YETISEN,

                Defendant.

Steven A. Platt
Devin Barrett
J. Max Weintraub
Nancy Pham
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

Dianne Schweiner
U.S. Attorney's Office – District of Oregon
Civil Division
1000 SW Third Avenue, Suite 600
Portland, OR 97204

      Attorneys for Plaintiff

Ashley M. Simonsen
Isaac D. Chaput
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067

Matthew J. Kalmanson
Hart Wagner, LLP
1000 SW Broadway, Suite 2000
Portland, OR 97205

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff the United States of America ("the Government") seeks to revoke Defendant Sammy Rasema Yetisen's naturalized United States citizenship. The Government previously moved for judgment on the pleadings as to Count IV and Count V of its Complaint. This Court granted the Government's motion as to Count IV for illegal procurement of naturalization due to lack of good moral character and declined to address Count V (procurement of naturalization by concealment of a material fact or by willful misrepresentation). *See United States v. Yetisen*, 370 F. Supp. 3d 1191 (D. Or. 2019). The Ninth Circuit Court of Appeals reversed and remanded. *United States v. Yetisen*, No. 19-35200, 2021 WL 4739293 (9th Cir. Oct. 12, 2021). The Government now moves for summary judgment on Counts I, II, III, and V.

## BACKGROUND

      Defendant Sammy Yetisen was born in 1972 in the town of Sanski Most in the former Socialist Federal Republic of Yugoslavia. Def. Ex. 1 ("Yetisen Dep.") 15:24-16:6, ECF 85-1. Sanski Most now lies within the country of Bosnia and Herzegovina ("Bosnia"). *Id.* Bosnia is home to a multi-ethnic society where secular national identities are based on the religion of the residents' ancestors. Govt. Ex. E (Tomljanovich Report) ¶¶ 22-23, ECF 84-5. Bosnia contains three large ethnic/religious groups: Bosniak Muslims, Croat Catholics, and Serb Orthodox

Christians. *Id.* ¶ 31. Defendant is a Bosniak or ethnic Muslim. Govt. Ex. C (Def. Resp. to Govt.'s Reqs. for Admis.) Nos. 2, 3, ECF 84-3.

## I.    The Bosnian War

By 1991, after years of political and economic turmoil, the former Yugoslavia was disintegrating. Govt. Ex. E ¶¶37-42. Several regions within Yugoslavia formed independent republics. *Id.* ¶¶ 38-45. Bosnia became an independent state in March 1992. *Id.* ¶ 50. At that time, tensions between the three ethnic/religious groups within Bosnia began to flair. *Id.* ¶¶ 41-46. Bosnian Serbs formed a military known as the Army of Republika Srpska ("VRS"), which was supported by the neighboring Republic of Serbia. *Id.* ¶¶ 52-55. Bosnian Croats also formed a local army know as the Croatian Defense Council ("HVO"), which was supported and controlled by the neighboring Republic of Croatia. *Id.* ¶¶ 56-59. Meanwhile, the newly independent Bosnian state created the Army of the Republic of Bosnia and Herzegovina ("ABiH"). *Id.* ¶ 69.

In the spring of 1992, civil war broke out between the three ethnic/religious groups. *Id.* ¶ 84. At first, the predominantly Croat HVO fought on the same side as the mostly Bosnian ABiH against the Serbian VRS. *Id.* But by late 1992 HVO and ABiH each became more ethnically homogenous, and the two armies began fighting against each other. *Id.* ¶¶ 93-99. And by April 1993, HVO and ABiH were in open conflict with each other in central Bosnia. *Id.* ¶¶ 100-105.

## II.    Defendant's Military Service in ABiH and the Zulfikar Unit

In April 1992, Defendant was 19 years old and still living in the town where she was born—Sanski Most—when Serbian forces took control of the town. Yetisen Dep. 53:19-24; 55:5-23. The Serbian VRS essentially placed the residents of the town on home detention—they could not leave their homes without fear of being beaten up or killed. *Id.* at 53:1-18. Defendant

was "tortured, interrogated, raped, mistreated in every possible way" during the occupation. *Id.*
at 54:2-3. In September 1992, members of the Serbian military picked Defendant and her brother
off the street and transported them in a convoy to central Bosnia. *Id.* at 56:17-57:10. At some
point, Defendant was released from the convoy in the town of Travnik, where there had recently
been a massacre of civilians. *Id.* at 76:22-24. Defendant and her brother ran away from the town
and ended up as refugees on a Bosnian military base. *Id.* at 76:24-77:6.

From there, at age 19, Defendant joined the Bosnian Army. *Id.* at 77:19-78:2. Defendant
explains that she joined the army so that she could get more than one meal a day and receive
medical care as "my way to survive." *Id.* at 77:12-21. She first served in the Prv Krajiski
Battalion, also known as the unit VJ 5089. *Id.* at 82:15-22; Govt. Ex. D, ECF 84-4. Defendant
joined the Handzar Division in early 1993. Govt. Ex. G at 5, ECF 84-7. While serving in those
units, Defendant wore a military uniform, carried a weapon, and engaged in active combat on the
front lines. Yetisen Dep. 79:2-81-2. Then, in April 1993, Defendant joined the Zulfikar Unit, an
elite special forces unit of the Bosnian army. Govt. Ex. G at 5.

## III.    Trusina Massacre

On April 16, 1993, Defendant and other members of the Zulfikar Unit participated in a
pre-planned attack to capture the village of Trusina in Central Bosnia Govt. Ex. E ¶¶ 158-162;
Govt. Ex. I at 9-10, ECF 84-9. The population of Trusina was evenly split between Muslim
Bosniaks and Catholic Croats. Govt. Ex. E ¶ 150. When the Zulfikar Unit arrived in Trusina,
local guides showed them which houses belonged to Croats and which belonged to Bosniaks.
Govt. Ex. I at 10. When the attack began, members of the Croat HVO were present and returned
fire, but the Zulfikar Unit managed to take control of the town. Govt. Ex. E ¶ 163. During the

attack, Zulfikar Unit soldiers shot and killed several people who wore civilian clothing. Govt. Ex. I at 11.

During the fighting, Defendant witnessed her commanding officer be shot and killed by Croat forces. Yetisen Dep. 144:2-20. Defendant entered one house and encountered a Croat woman who had just been raped by members of her own the Zulfikar Unit. *Id.* at 143:8-24. According to Defendant, she was devastated and traumatized by what she witnessed. *Id.* at 143:1-14.

When Defendant came out of the house where the woman had been raped, some unarmed Croat civilians and soldiers were lined up against the wall of a house or barn. Govt. Ex. I at 10-11. A commanding officer ordered Defendant and other Zulfikar members to open fire. *Id.* at 12. Along with other Zulfikar soldiers, Defendant shot at the people who were lined up. *Id.* Defendant does not know if she hit or killed anyone. Yetisen Dep. 149:6-8. Afterward, a commanding officer instructed Defendant to check and see if all the people they shot were dead. Govt. Ex. I at 12. Defendant found that they were all dead. *Id.* She then accidentally fired several rounds at the ground by her feet. *Id.* In total, the Zulfikar Unit killed 22 Croats—fifteen civilians and seven HVO prisoners of war—in Trusina that day. Govt. Ex. E ¶ 165. Defendant claims that she did not know the religion of the people who were shot and that their religion or ethnicity did not matter to her. Yetisen Dep. 152:4-11. "The only thing that matter[ed] is that . . . you have to obey and do . . . what you are ordered to do it." *Id.* at 156:7-9.

## IV.   Defendant's Immigration to the United States

Defendant was discharged from the Bosnian Army in May 1995. Govt. Ex. D. She appeared at the U.S. embassy in Austria that October seeking refugee status. *Id.* On her Form I-590, she stated that she "had no means for survival anymore (no home, food, clothing, shoes)."

*Id.* She reported on the Form I-590 that she had been in Unit VJ 5089 from September 3, 1992 to May 12, 1995. *Id.* Defendant also completed a sworn statement, form G-646, in front of Immigration Officer Harold Woodward. Govt. Ex. J, ECF 84-10. Defendant answered "No" when asked if she belonged to a class of persons "who have committed or who been convicted of a crime involving moral turpitude." *Id.* Defendant also stated: "I have never ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion," and signed the form. *Id.* Based on representations she made in her Form I-590, Form G-646, and her sworn testimony during her refugee interview, the former Immigration and Naturalization Service ("INS") approved Defendant's request for refugee status in February 1996, and she entered the United States as a refugee in May 1996. Govt. Ex. L, ECF 84-12.

After living in Oregon for two years, Defendant applied to adjust her status and become a lawful permanent resident. Def. Ex. 5, ECF 85-5. She was granted permanent resident status in March 1998. Govt. Ex. M, ECF 84-13. Defendant applied for naturalization on July 12, 2001. Govt Ex. N, ECF 84-14. On her Form N-400, Defendant checked "No" to the question: "Have you ever knowingly committed any crime for which you have not been arrested?" *Id.* She also checked "No" to the question: "Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?" *Id.* Finally, Defendant answered "none" to the question: "List your present and past membership in or affiliation with every organization . . . in the United States or in any other place. Include any military service in this part." *Id.*

On March 25, 2002, Defendant attended a naturalization interview with INS Officer Judith Parker. *Id.* After placing Defendant under oath, Officer Parker asked her certain questions from the Form N-400, marking any confirmed answers with a red slash mark. Govt. Ex. P

("Parker Dep.") 23:14-25:4, ECF 84-16. Officer Parker also annotated in red ink any updates or changes to Defendant's written answers based on the interview. *Id.* The INS approved Defendant's application, and she naturalized as a United States citizen on May 23, 2002. Govt. Ex. Q, ECF 84-17.

## V.    Defendant's Extradition to Bosnia and Criminal Conviction

On September 21, 2009, the Prosecutors Office of Bosnia and Herzegovina issued a warrant for Defendant's arrest for war crimes against civilians and prisoners of war committed during the Croat-Bosniak War. Compl. ¶¶ 90, 91, ECF 1. Prosecutors accused her of participating in the execution-style murders of several Croat civilians and prisoners of war during the attack on the village of Trusina on April 16, 1993. *Id.* ¶ 90. Bosnia issued a Request for Extradition on July 7, 2010, and the United States commenced extradition proceedings against Defendant on April 11, 2011. *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 982-83 (D. Or. 2011). Finding probable cause that Defendant had committed the offenses for which extradition was sought, this Court granted the Government's request for a certificate of extraditability. *Id.* at 998-99. Defendant was extradited to Bosnia and Herzegovina in December 2011. Compl. ¶ 99. In April 2012, Defendant entered into a plea agreement and was convicted of "War Crimes Against Civilians under Article 173(1)(c) and War Crimes against Prisoners of War under Article 175(1)(a)" of the criminal code of Bosnia and Herzegovina. Govt. Ex. H ¶ 2. She was sentenced to a term of imprisonment of five years and six months. *Id.* ¶ 74. Upon release after serving her term, Defendant returned to Oregon where she currently resides.

On April 4, 2018, the Government filed this civil action to revoke Defendant's naturalized United States citizenship under 8 U.S.C. § 1451. Compl. ¶ 1. The Government contends that Defendant illegally procured her naturalization because she was ineligible for

admission as refugee and because she lacked good moral character and willfully misrepresented and concealed material facts during the naturalization process. *Id.* ¶¶ 120-172.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

The denaturalization statute, 8 U.S.C. § 1451, requires courts to revoke the citizenship of any naturalized United States citizen whose order and certificate of naturalization "were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a), (e). A certificate of citizenship is "illegally procured" if the naturalized citizen failed to strictly comply "with all congressionally imposed prerequisites to the acquisition of citizenship." *Federenko v. United States*, 449 U.S. 490, 506 (1981). Statutory requirements for naturalization include being "lawfully admitted for permanent residence" in the United States and having "good moral character." 8 U.S.C. § 1427(a), (d). Because "its loss can have severe and unsettling consequences . . . the Government 'carries a heavy burden of proof in a proceeding to divest a naturalized citizen of [their] citizenship.'" *Federenko*, 449 U.S. at 505 (quoting *Costello v. United States*, 365 U.S. 265, 269 (1961)). "In view of the grave consequences to the citizen," the evidence justifying revocation of citizenship must be "clear, unequivocal, and convincing and not leave the issue in doubt." *Costello*, 365 U.S. at 269 (internal quotation marks and citation omitted).

The Government brings five counts against Defendant for denaturalization under 8 U.S.C. § 1451(a). Count 1 alleges that Defendant did not qualify as a permanent resident because she was ineligible for refugee status under the "persecutor bar." Count 2 alleges that Defendant did not qualify as a permanent resident because she misrepresented material facts in her application for admission to the United States as a refugee. Count 3 asserts that Defendant lacked good moral character because she provided false testimony during her naturalization interview. Count 4 asserts that Defendant lacked good moral character because she had committed crimes involving moral turpitude. Count 5 alleges that Defendant willfully

misrepresented or concealed material facts during her naturalization proceedings. If the Government proves any one of these counts, Defendant's naturalization must be revoked. *See Federenko*, 449 U.S. at 517 ("[D]istrict courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally or by willful misrepresentation of material facts.")

On October 12, 2021, the Ninth Circuit reversed this Court's grant of judgment on the pleadings for the Government as to Count IV (lack of good moral character) and remanded the case for further proceedings. *United States v. Yetisen*, No. 19-35200, 2021 WL 4739293 (9th Cir. Oct. 12, 2021). The Government now  moves for summary judgment on Counts I, II, III, and V. Defendant argues that genuine disputes of material facts preclude summary judgment for the Government on each count as does her equitable defense of laches.

## I.    Count 1 – Persecutor Ineligible for Admission as a Refugee

Being lawfully admitted to the United States as a permanent resident is a prerequisite to naturalization. 8 U.S.C. § 1429. Defendant entered the United States as a refugee in 1996 and adjusted status to become a permanent resident in 1998. Lawful admission to the United States was necessary for Defendant to adjust status, and her status as a permanent resident was a requirement for her to apply for naturalization. The Government contends that Defendant was not admissible to the United States as a refugee under the "persecutor bar." Thus, according to the Government, Defendant was never eligible for naturalization.

Under United States immigration law, "[t]he term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the *persecution* of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42) (emphasis added). Thus, a noncitizen who engaged in

persecution is ineligible for refugee status under the "persecutor bar." The statute does not define "persecution." In the immigration context, the Ninth Circuit defines persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Aden v. Wilkinson*, 989 F.3d 1073, 1082 (9th Cir. 2021) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995)). For the persecutor bar to apply, the noncitizen seeking refugee status must have persecuted "on account of" the victim's protected characteristic. *De Leon Vasquez v. Garland*, No. 21-70254, 2022 WL 301549, at *1 (9th Cir. Feb. 1, 2022). But "the protected ground need only constitute a motive for the persecution in question; it need not be the sole motive." *Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1076 (9th Cir. 2004) (citation omitted).

To determine whether a noncitizen "assisted" or "participated in" persecution, a court "should engage in a particularized evaluation of both personal involvement and purposeful assistance" to determine whether the individual's behavior was sufficiently culpable. *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 926 (9th Cir. 2006). The court may need to engage in "line-drawing" within a "continuum of conduct." *Id.* at 928 (citing *Federenko*, 449 U.S. at 512 n.34). Assisting or participating requires more than "[m]ere acquiescence or membership in an organization" that engaged in persecution. *Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1252 (9th Cir. 2004) (quoting *Laipenieks v. INS*, 750 F.2d 1427, 1431 (9th Cir. 1985)). On the other hand, the persecutor bar does not require that the noncitizen performed "actual trigger-pulling." *Miranda Alvarado*, 449 F.3d at 927. And "under the persecutor bar, the noncitizen need not share in the persecutory motive." *De Leon Vasquez*, 2022 WL 301549, at *2 (citation omitted).

Assistance or participation requires that the noncitizen's actions "involve[d] some personal activity involving persecution." *Id.* To assess personal participation in persecution,

courts examine whether the noncitizen's  involvement was "active or passive." *Kumar v. Holder*, 728 F.3d 993, 998 (9th Cir. 2013) (citing *Miranda Alvarado*, 449 F.3d at 927-98). Courts also look at whether the noncitizen's acts "were material to the persecutory end." *Id.* at 999. The length of time the noncitizen was involved, any threats used to compel assistance, and any efforts by the noncitizen to escape are relevant to determining individual culpability. *Miranda Alvarado*, 449 F.3d at 927.

Defendant's alleged participation or assistance in persecution involved the well-documented killing of unarmed civilians and captured soldiers during the attack on Trusina on April 16, 1993. Defendant concedes that these atrocities occurred. And undisputed facts show that she pleaded guilty and was convicted of War Crimes against Civilians and War Crimes against Prisoners of War under the Bosnian criminal code. But Defendant argues that the facts are disputed as to whether she participated or assistance in the persecution of victims *on account of* a protected ground.

The Government relies on the expert report and deposition testimony of its expert, Dr. William Tomljanovich—a historian who has studied the "Wars of Yugoslav Succession," including the Bosniak-Croat conflict, for 23 years.[1] Govt. Ex. E ¶ 3. Dr. Tomljanovich's report explains and details the nationalistic and religious divisions in Bosnia during the war. *Id.* ¶ 177.

---

[1] Defendant objects to the expert testimony of Dr. Tomljanovich. Defendant argues that Dr. Tomljanovich's testimony is inadmissible under Federal Rule of Evidence 702 because he does not offer an opinion specific to Defendant or her role in the events at Trusina. As such, Defendant asserts that Dr. Tomljanovich offers only a factual narrative, which is not the role of an expert under Rule 702. But the Court finds that Dr. Tomljanovich is a qualified expert in the history of ethnic and religious conflict during the Balkan wars following the dissolution of the former Yugoslavia. Even though he does not offer a specific opinion on whether Defendant engaged in persecution, Dr. Tomljanovich's expert opinion is helpful to the Court in understanding the motivation of Defendant's army unit on the day of the Trusina massacre. Accordingly, Dr. Tomljanovich's expert opinion is admissible under Rule 702.

Several undisputed facts support Dr. Tomljanovich's conclusion that the actions by the Zulfikar Unit against Croat civilians in Trusina on April 16, 1993, amounted to "discriminat[ion] on the basis of nationality, religion and ethnicity on the day of the attack." *Id.* Both Catholic Croats and Muslim Bosniaks lived in Trusina. When the exclusively Bosniak Zulfikar Unit arrived at Trusina, local guides showed them that part of Trusina was Bosniak Muslim and another part was Catholic Croat. The guides showed the Zulfikar Unit which houses they needed "to clean" because they belonged Croats. Govt. Ex. G at 7. Croat soldiers and civilians were lined up and shot by Bosniak members of the Zulfikar Unit. Thus, the Court finds no genuine dispute that the Zulfikar Unit engaged in persecution of Bosnian Croats based on the intertwined combination of their religion and ethnicity.

Next, undisputed facts show that Defendant participated or, at minimum, assisted in the persecution. Although Defendant credibly asserts that she was not religious at the time and had no animosity toward people of any religion, she cannot plausibly claim that she was unaware of the motives of the Zulfikar Unit in Trusina or that she did not know that the people being assassinated were Croats. Defendant contends that under *Miranda Alvarado*, the Government does not conclusively show that she was personally involved or purposefully assisted in the attack. But Defendant's contention is belied by uncontroverted facts.

When Defendant came out of a house, she saw people lined up and heard an officer give a command to open fire. Defendant admits firing her weapon, although she does not know if her bullets hit anyone. Thus, no matter whether Defendant shot at Croatian civilians and prisoners of war *because* of their religion or ethnicity, her involvement was not passive and she "participated" in the persecution. *See Kumar*, 728 F.3d at 998.

13 – OPINION & ORDER

At minimum, Defendant "assisted" in the persecution. In explaining the line-drawing

courts must do, the Supreme Court in *Federenko* concluded:

> [t]here can be no question that a guard who was issued a uniform and armed with a
> rifle and a pistol, who was paid a stipend and was regularly allowed to leave the
> concentration camp to visit a nearby village, and who admitted to shooting at
> escaping inmates on orders from the commandant of the camp, fits within the
> statutory language about persons who assisted in the persecution of civilians.

449 U.S. at 512 n.34. Even if she had not fired her weapon or if she fired her weapon without

intending to hit anyone, Defendant's presence as an armed Bosniak soldier would have prevented

Croatian civilians from fleeing or escaping from the firing squad. *See United States v. Reimer*,

356 F.3d 456, 460 (2d Cir. 2004) (upholding denaturalization of a former Ukrainian Nazi

prisoner of war when he had assisted in persecution because his "presence just as much as that of

the other armed guards forced the victim to remain in [a] pit waiting to be murdered").

Defendant's actions fall squarely within the statutory meaning of "assisted" in persecution.

Defendant argues that the Government cannot prove that any "assistance" she provided

was purposeful or voluntary. She contends that she was just following orders. And she asserts

that she fired her weapon "without being aware" because of the "terrible shock" she was in after

seeing a woman who had been raped, particularly after having been a victim of sexual violence

herself. But "in assessing the character of an individual's conduct, we look[] not to the

voluntariness of the person's actions, but to [their] behavior as a whole." *Xie v. I.N.S.*, 434 F.3d

136, 142-43 (2d Cir. 2006). An individual assisted in persecution "[w]here the conduct was

active and had direct consequences for the victim." *Id.* at 143.

Defendant is correct that the Court must consider whether her actions were "motivated by

self-defense or other extenuating circumstances." *Miranda Alvarado*, 449 F.3d at 929. But

Defendant does not contend that she acted in self-defense or that she tried to resist the order to

shoot. *See id.* at 927 (noting that courts may consider any efforts the alleged persecutor made to escape from the situation). As a young woman who had witnessed the atrocities of war and experienced her own trauma, she may have felt compelled to follow the orders of her commanding officer. But "the persecutor bar does not include an exception for coercion or duress." *Matter of Negusie*, 28 I. & N. Dec. 120, 121 (2020). And Defendant does not identify any specific threats from fellow soldiers or commanding officers that forced her to shoot at unarmed civilians and prisoners of war.

Defendant's actions in Trusina on April 16, 1993, meet the statutory definition of "participating" or "assisting" in persecution based on religion or ethnicity under the standard outlined by the Ninth Circuit in *Miranda Alvarado*.[2] As a result, Defendant was ineligible for refugee status under the persecutor bar. Because Defendant was never lawfully admitted to the United States, she did not satisfy the statutory prerequisites for naturalization. The Court, therefore, grants summary judgment for the Government on Count 1—illegal procurement of naturalization under 8 U.S.C. § 1451 because Defendant was ineligible for admission as a refugee.

///

---

[2] The Government contends that the standard for individual culpability outlined in *Miranda Alvarado* has been superseded by a new standard articulated by the Board of Immigration Appeals in *Matter of D-R-*, 27 I. & N. Dec. 105 (B.I.A. 2017). In *Matter of D-R-*, the Board rejected the Ninth Circuit's distinction between "active" and "passive" participation. *Id.* at 120. The Board described "a more specific test . . . that considers (1) the nexus between the alien's role, acts, or inaction, and the [persecution]; and (2) [the alien's] scienter, meaning [their] prior or contemporaneous knowledge of the [persecution]." *Id.* Although, the Ninth Circuit has not explicitly overruled *Miranda Alvarado* and adopted the standard outlined in *Matter of D-R-*, the Government urges the Court to apply *Matter of D-R-* because the Board's decision is entitled to *Chevron* deference. Because the Court finds that Defendant's actions show that she assisted in persecution under *Miranda Alvarado*, which is Defendant's preferred standard, it declines to apply the Government's proposed test under *Matter of D-R-*.

## II.    Count 2 – Procured Refugee Status by Willful Misrepresentation

Under 8 U.S.C. § 1182(a)(6)(C)(i), a noncitizen is inadmissible if the person "by fraud or willfully misrepresenting a material fact," procured an immigration benefit, including admission to the United States. The Government argues that Defendant willfully misrepresented her membership in the Zulfikar Unit and her actions at Trusina to obtain admission to the United States as a refugee. And because she was never lawfully admitted, she was ineligible for naturalization. *See* 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence[.]").

In the immigration context, a misrepresentation claim requires proof of four elements: (1) misrepresentation of some fact; (2) the misrepresentation was "willful"; (3) the misrepresented fact was "material";  and (4) the defendant procured citizenship or some other immigration benefit as a result of the misrepresentation. *Kungys v. United States*, 485 U.S. 759, 767 (1988). Willfulness is established where the misrepresentation was "deliberate and voluntary." *Forbes v. I.N.S.*, 48 F.3d 439, 442 (9th Cir. 1995). Willfulness does not require proof of intent to deceive; knowledge that the representation was false is sufficient. *Id.* "[M]isrepresentation is *material* if it "has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys*, 485 U.S. at 770 (emphasis added). In other words, the Government must prove by clear and convincing evidence that Defendant's misrepresentations had a natural tendency to produce the conclusion that she qualified for admission as a refugee. *See id.* at 771-72.

The Government asserts that Defendant made two misrepresentations on her Form G-646 (Sworn Statement of a Refugee Applying for Entry into the United States). Govt. Ex. J. On the

form, Defendant stated: "I have never ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion." *Id.* This statement was false. *See* I, *supra.* Defendant also answered "no" to whether she belonged to the class of persons "who have committed or who have been convicted of a crime involving moral turpitude." Govt. Ex. J.  At the time, Defendant had not been convicted of any crimes. But because she had committed acts for which she was later convicted of war crimes, this statement on her Form G-646 was false. Defendant also failed to disclose that she served in the Zulfikar Unit on her Form I-590. Govt. Ex. D. She only disclosed that she served in VJ 5089, her first military unit in the Bosnian army. *Id.*

The Court finds that these misrepresentations were willful because they were made deliberately and voluntarily. *See Forbes,* 48 F.3d at 442. Defendant knew that on April 16, 1993, Croat civilians and prisoners of war in Trusina were lined up and shot by her Bosnian army unit. Defendant was present, did not object or attempt to escape the scene, and fired her weapon at the victims. Thus, she knowingly assisted in the persecution. The Court finds it implausible that she did not know that her actions constituted persecution at the time she applied for admission to the United States as a refugee. The Court also finds that she would have known that shooting at unarmed civilians was a crime, even if done on the order of her commanding officer. Thus, the statement and answer provided on her Form G-646 were willful misrepresentations.

As to the third element, Defendant's misrepresentations on her refugee application were material to the immigration benefit she sought: admission to the United States as a refugee. Whether a misrepresentation is material is generally a legal question for a court to resolve. *Kungys,* 485 U.S. at 771. A false statement or misrepresentation is material if "it has a natural tendency to affect, the official decision." *Id.* The Government is not required to prove that

Defendant's misrepresentations "*more likely than not*" caused the INS to make an erroneous decision to admit her as a refugee. *Id.* at 771.

Thus, the Court need not determine whether Defendant's refugee application would have or would likely have been denied if she had disclosed her membership in the Zulfikar Unit or her participation in the events at Trusina. Because the persecutor bar excludes anyone who *assisted* in persecution, knowing that Defendant served in the Zulfikar Unit and was present on the day of the Trusina massacre would have had a "natural tendency to affect" the INS's decision to grant her refugee status. Thus, the misrepresentations Defendant made in applying for admission to the United States as a refugee were material to that end. The Court grants summary judgment for the Government on Count 2 of its denaturalization claim.

## III.    Count 3 – Lack of Good Moral Character Because of False Testimony During Naturalization Interview

In Count 3, the Government asserts that Defendant knowingly made several false statements during her naturalization interview. The Government claims that because Defendant made false statements during the naturalization process, she lacked the requisite good moral character necessary to become a naturalized citizen. Thus, according to the Government, Defendant was ineligible for naturalization, and she illegally procured her citizenship.

To be eligible for naturalization, an applicant must establish that they had "good moral character" from five years immediately preceding the date of filing an application for naturalization until citizenship is granted. 8 U.S.C. § 1427(a); 8 C.F.R. § 316.2(a)(7); *see United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007). The statutory and regulatory definition of "good moral character" excludes any person who has committed certain specified crimes or any crime involving moral turpitude during the statutory period. 8 U.S.C. § 1101(f)(3); 8 C.F.R. § 316.10(b)(2)(i)-(iv). In addition, any "unlawful acts that reflect upon the applicant's moral

character" preclude a finding of good moral character. 8 C.F.R. § 316.10(b)(3)(iii). The Ninth

Circuit found that as to Count 4 of the Government's Complaint, the lack of good moral

character bar did not apply because any crime Defendant committed at Trusina occurred before

the beginning of the five-year statutory period. *Yetisen*, 2021 WL 4739293, at *2.

But an applicant for naturalization also lacks good moral character if the applicant has

given false testimony under oath to obtain an immigration benefit. 8 U.S.C. § 1101(f)(6); 8

C.F.R. § 316.10(b)(2)(vi). For the purpose of determining good moral character, "testimony is

limited to oral statements made under oath," and does not include "other types of

misrepresentations or concealments, such as falsified document or statements not made under

oath." *Kungys*, 485 U.S. at 780. The prohibition on finding good moral character "applies

regardless of whether the information provided in the false testimony was material" to obtaining

the immigration benefit. 8 C.F.R. § 316.10(b)(2)(vi); *see id.* at 781 (finding no materiality

requirement for false testimony under 8 U.S.C. § 1101(f)(6)).

During her naturalization interview with INS Officer Judith Parker, Defendant affirmed

under oath several of the answers she gave on her Form N-400 Application for Naturalization.

First, Defendant affirmed her answer of "no" to the question asking if she had "at any time,

anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any

person because of race, religion, national origin, or political opinion." Govt. Ex. N; Govt. Ex. O

¶ 12. As the Court has found, based on undisputed facts, Defendant participated, or at least

assisted, in the massacre at Trusina on April 16, 1993. *See* I, *supra*. Thus, Defendant's statement

to Officer Parker was false.

Second, Defendant answered "no" to the question on the Form N-400 asking whether she

had ever "knowingly committed any crime for which you have not been arrested." Govt. Ex. N.

When asked the same question orally by Officer Parker, Defendant again answered "no." Govt. Ex. O ¶ 13. In 2012, Defendant pleaded guilty and was convicted under the criminal code of Bosnia of "War Crimes against Civilians under Article 173(1)(c) (participation in killings)" and "War Crimes against Prisoners of War under Article 175(1)(a) (participation in killings of prisoners of war)" for actions in Trusina on April 16, 1993. Govt. Ex. H. To accept the plea agreement, the Bosnian court "found that there is sufficient evidence proving the guilt of [Defendant]." *Id.* ¶ 71. In doing so, the court found that Defendant had the requisite *mens rea*— "the accused acted with an intent to commit the crime." *Id.* ¶ 70. Thus, at the time of her application for naturalization, Defendant had committed crimes for which she had not yet been arrested. The Court finds it implausible that Defendant would not have known that participating or assisting in the killing of civilians and prisoners of war at Trusina was a crime. Thus, Defendant's answer to this question was false.

Lastly, when asked to list her present and past membership in organizations, including military service, Defendant answered "none." Govt. Ex. N. Defendant affirmed her answer orally under oath during her naturalization interview with Officer Parker. Parker Dep. 48:18-49:9. As Defendant served in the Bosnian army from 1992 to 1995, this answer was false.

Defendant argues that the Government cannot prove that she made these statements with the subjective intent to obtain naturalization. Questions of intent are generally factual matters to be decided by the trier of fact. *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982); *Vucinich v. Paine, Webber, Jackson, & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) ("Summary judgment is generally inappropriate when mental state is an issue[.]"). To show that Defendant lacked good moral character, it is the Government's burden to prove by clear and convincing evidence that Defendant intended to make these statements to Officer Parker for the purpose of

obtaining United States citizenship. Any other reason, "such as embarrassment, fear, or a desire for privacy" would not be "deemed sufficiently culpable to brand [Defendant] as someone who lacks good moral character" under § 1101(f)(6). *Kungys*, 485 U.S. at 780.

The Court finds it implausible that Defendant intended to make these statements for any other reason but obtaining United States citizenship. The Court has already concluded that it was implausible Defendant did not know her actions constituted persecution or that shooting at unarmed civilians was a crime at the time that she applied for admission to the United States. And the Government has shown that Defendant repeated these false statements under oath during her naturalization interview. The only plausible reason Plaintiff would have for repeating these particular falsehoods during her citizenship interview was to obtain naturalization. Thus, the Government has demonstrated Defendant lacked good moral character based on the false statements she made during her naturalization interview. The Court grants summary judgment for the Government on Count 3.

## IV.    Count 5 – Willful Representation and Concealment of Material Facts During Naturalization

Independent of its lack of good moral character claim, the Government seeks to revoke Defendant's naturalization because she willfully misrepresented and concealed facts during the naturalization process. The Government argues that Defendant concealed her membership in the Bosnian army, including the Zulfikar Unit, and concealed that she assisted in persecution and committed war crimes at Trusina.

Unlike Count 2, which focuses on Defendant's misrepresentations in applying for refugee status under 8 U.S.C. § 1182(a)(6)(C)(i), the Government in Count 5 claims that Defendant illegally procured naturalization under 8 U.S.C. § 1451(a) by concealing material facts in her naturalization application. A misrepresentation or concealment claim has "four independent

requirements: [1] the naturalized citizen must have misrepresented or concealed some fact; [2] the misrepresentation of concealment must have been willful; [3] the fact must have been material; and [4] the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Kungys*, 485 U.S. at 767.

Defendant answered three questions on her Form N-400 Application for Naturalization in which she misrepresented or concealed facts. Govt. Ex. N; *see* III, *supra*. On the form, Defendant denied that she ever assisted or participated in persecution and denied that she ever knowingly committed a crime for which she had not been arrested. She also failed to disclose that she served in any unit of the Bosnian army. The misrepresentations were willful because Defendant answered these questions deliberately and voluntarily. *See Forbes*, 48 F.3d at 442. Defendant signed the Form N-400 under penalty of perjury and confirmed her answers under oath during her naturalization interview. *See United States v. Hirani*, 824 F.3d 741, 749 (finding an applicant's signature under penalty of perjury on his Form N-400 showed that his misrepresentation on the form was willful). To succeed on this claim, the Government need not prove that Defendant intended to deceive immigration authorities. *Espinoza-Espinoza v. I.N.S.*, 554 F.2d 921, 925 (9th Cir. 1977). Thus, regardless of her subjective intent, Defendant willfully misrepresented or concealed facts on her application for naturalization.

As for materiality, the Government must only show that the facts Defendant misrepresented or concealed were "predictably capable of affecting . . . the official decision." *Kungys*, 485 U.S. at 771. Defendant's truthful disclosure of her military service and her actions in Trusina on the day of the massacre would have had a "natural tendency to affect" INS's decision to approve of her naturalization application. *Id.* Thus, Defendant illegally procured her

citizenship by willfully misrepresenting and concealing material facts. The Court grants summary judgment for the Government on Count 5.

## V.    Laches Defense

Defendant asserts the equitable defense of laches because the Government brought this action sixteen years after Defendant was naturalized in 2002. The Court previously found that Defendant is not categorically barred from asserting a laches defense in this civil denaturalization proceeding. *See United States v. Yetisen*, No. 3:18-cv-00570-HZ, 2022 WL 3644926, at *5 (D. Or. Aug. 22, 2022). The Government now asserts that it is entitled to summary judgment on the merits of this defense.

The doctrine of laches is "an equitable time limitation on a party's right to bring a suit." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). The purpose of laches is to prevent prejudice to the defendant because of "the plaintiff's unreasonable delay[.]" *Id.* Laches applies when a plaintiff postpones filing suit until long after it has actual or inquiry notice that it has a claim. *Ross Dress for Less, Inc. v. Makarios-Or., LLC*, 180 F. Supp. 3d 745, 777 (D. Or. 2016). A plaintiff is considered to have inquiry notice when it knows of facts that "would have put a duty to inquire on a person of ordinary intelligence." *Id.* (citation omitted).

"Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Dang*, 488 F.3d at 1144 (quoting *Costello*, 365 U.S. at 282). In denaturalization actions, the Government does not lack diligence "merely because of the number of years that have elapsed since naturalization." *United States v. Arango*, No. CV 09-178 TUC DCB, 2014 WL 7179578, at *14 (D. Ariz. Dec. 17, 2014), *aff'd*, 686 F. App'x 489 (2017). The Government has often successfully brought denaturalization cases many years after defendants had been granted naturalization. *See, e.g.*, *Kungys*, 485 U.S. at 764

(bringing denaturalization case because the defendant had made misrepresentations and lacked good moral character when he naturalized 34 years before); *Costello,* 365 U.S. at 281 (laches did not apply to 27-year delay in instituting denaturalization proceedings); *United States* v. *Teng Jiao Zhou*, 815 F.3d 639, 641 (9th Cir. 2016) (commencing denaturalizing proceedings twenty years after the defendant naturalized); *Arango*, 2014 WL 7179578, at *14 (denaturalization suit brought sixteen years after naturalization); *United States v. Multani*, No. 2:19-cv-01789-BJR, 2021 WL 633638 (W.D. Wash. Feb. 18, 2021) (initiating civil denaturalization proceeding thirteen years after the defendant naturalized). Thus, the sixteen-year gap here between Defendant's naturalization and the Government's initiation of denaturalization proceedings alone does not implicate laches. The question is whether the Government unreasonably delayed in bringing this civil denaturalization action after it knew, or had inquiry notice, of facts that made Defendant ineligible for citizenship.

Because Defendant misrepresented her persecutory acts at Trusina when she applied for admission to the United States as a refugee and concealed her military service in the Bosnian army during her naturalization proceedings in 2002, the Government had no inquiry notice of the relevant facts. The Government gained actual knowledge of the facts that cast doubt on Defendant's eligibility for naturalization in 2009 when Immigration and Customs Enforcement learned that Defendant had served in the Zulfikar Unit. Govt. Ex. R at 6, ECF 84-18. Although the Government did not bring this denaturalization action until 2018, the delay is excusable. Defendant underwent extradition, criminal prosecution, and incarceration during that time. The Government filed this case shortly after Defendant was released from prison in Bosnia and returned to the United States. Thus, Defendant cannot show lack of diligence by the Government in bringing this action.

Defendant also does not show that she was prejudiced by the delay. Defendant's only claim for evidentiary prejudice is that the INS Officer who interviewed her as part of her refugee application is an ineffective witness because his memory has faded. Defendant asserts that this witness could have corroborated her contention that she disclosed the details of her military service when she sought refugee status. The Court finds that any testimonial evidence from this witness would not be relevant to her defense. Defendant still failed to disclose her acts of persecution in her refugee application and misrepresented her military service during the naturalization process. Thus, Defendant's laches defense fails.

## CONCLUSION

The Court GRANTS the Government's Motion for Summary Judgment [84]. Defendant's naturalization must be revoked. The Government is directed to prepare and submit a Judgment to the Court consistent with this Opinion & Order within fourteen (14) days.

IT IS SO ORDERED.


DATED:  September 12, 2023  .



MARCO A. HERNÁNDEZ
United States District Judge